is first, and we'll hear from counsel. Good morning, your honors. May it please the court, my name is Jillian Harrington, and I was assigned by this court to represent petitioner appellant Martin Heidgen on this appeal of the denial of his petition for a writ of habeas corpus. I'd like to thank the As your honors are of course aware, we received a certificate of appealability from this court on one issue alone, which is whether the evidence at the trial was sufficient to establish beyond a reasonable doubt that Mr. Heidgen acted with the new mens rea that is necessary to support his conviction of depraved indifference murder. We of course asked this court to find that it was not. This case has been kicking around the courts, the state and the federal courts for more than 16 years now, and this issue has been presented to all of them. Sadly, none of the courts it was presented to saw fit to correct what clearly amounts to an overcharging of this defendant. We've never argued that he didn't commit a crime deserving of punishment. Our argument has consistently been that he deserved to be punished, but for the correct crime. And let me see if I can frame what I think the issue is. And you could tell me incorrectly, okay, it would have to be under sufficiency analysis that the it was irrational for the jury to conclude that notwithstanding your clients level of intoxication point to eight, that he still knew he was going the wrong way and kept going anyway, right? That's essentially the issue with that conclusion by the jury based upon the evidence in this case be irrational, crediting all the prosecution evidence, obviously, is that have I framed the issue properly? Yes, Your Honor, that is the standard that the Supreme Court has set for us. All right. And that was a standard that was applied by the state court, obviously, on habeas. But when I look back at Dr. Klassen, their expert was asked, listen to this question. Doctor, is there any reason provided from alcohol consumption that would prevent a person from reacting for over two and a half minutes, which is obviously the amount of time that your client drove the wrong way? And it was an overruled objection. And the answer was, was no. This was after the doctor said it could affect response time, perception time. But then there he says it for two and a half minutes, it wouldn't prevent someone who's intoxicated. And then we specifically asked about 2.8. Dr. Klassen from the toxicology studies, is there any indication that alcohol, even to the extent of like 0.28 would extend a perception reaction to, I think it's supposed to say two minutes. And he says, answer, I have never seen anything suggesting that. So why, my question to you, obviously there's other evidence that the prosecution points to, but what they credit that expert testimony, an expert was telling them that 0.28 up in itself doesn't mean the person can't perceive that they're going the wrong way. Because in order to, yes, Your Honor, that is all true. That is what the people's expert, Dr. Klassen testified to. However, what they didn't prove was that he knew that he was going in the wrong direction. Well, but if the alcohol wasn't sufficient to alter his perception, so he'd be oblivious to that. Obviously he was driving for two and a half minutes on the road, cars are passing him. They're beeping the horn. He's seeing, all these things are obviously in the record that unless the alcohol was making him oblivious to that, of course he would have understood that. Well, I mean, a 0.28, I don't think we can underestimate what a 0.28 is. I mean, Dr. Klassen also testified that that was approximately 20 alcoholic drinks. I don't think we can underestimate that. Yes, he was driving to two and a half miles. According to the people's witnesses, he was going 70 miles an hour. Was he looking at the signs? There was the one sign- Multiple cars passed him, multiple cars passed him. One was beeping, right? Yes. They pulled over before they got to him. Sadly, the limousine was the only one that was unable to because there was another car next to him. No, but he's seeing headlights coming at him, right? Yes, but when we're driving, we always do that. Perhaps the most devastating piece of evidence beyond, I think, the expert testimony was his response when they questioned him. Do you want to address that, that he was in a self-destructive mode? I know in the briefs you say it was a reference to he was a movie buff and he was just quoting movies, but obviously those are jury determinations. A jury doesn't have to create that explanation. They could say he was in a self-destructive mode. He didn't care. In a self-destructive mode doesn't mean suicidal, doesn't mean- It doesn't have to be suicidal. It doesn't have to be suicidal. I just don't care. I'm going to keep driving. I don't care. My life's not worth a lot. I'm just going to keep driving. I don't, not necessarily suicidal. You don't have to be suicidal to have that mindset. But there's no other evidence in the record. Everybody who testified said he was in a good with the self-destructive mode. We also have to look at the other part of that conversation in which the police asked him, were you trying to kill yourself? Like, were you trying to hurt yourself? Now you have to know if it's true that you're playing this horrific game of chicken with other cars on the road and you don't care. You have to know that you're going to end up dying. And three times the police asked him, were you trying to hurt yourself? And all three times he unequivocally said no. And we also have to keep in mind at this point, he didn't know that two people had tragically died in this accident. In fact, the police had asked his mother not to tell him that. He thought he hit a median. So we don't even know that he was driving on the wrong side and we really can't discount. We want to talk about Dr. Clausen as an expert. We also have to then credit Mr. Schneider, who was the defense expert, the only expert to testify about speed. And he testified that at the time of impact, Mr. Hygen was traveling at somewhere between 33 and 38 miles an hour. He did two separate tests. Now that means if we believe- Why do we have to credit that? That's the defense expert, right? We have to assume the facts most favorable to the prosecution, right? Absolutely. But they didn't put in any other expert. Well, first of all, they could have disbelieved that expert of the defense. For whatever reason, late testimony was allowed about the approximate speed. So they could have I'm not sure it'd be proper to say they had to credit the defense expert in terms of the speed. What about the fact that there was testimony that he was not slurring his words at the party? He was speaking appropriately and rationally. Why can't the jury consider that? Again, trying to figure out what his perception level was. They can consider all of that. And that was all testimony by his friends who were at the party with him. But if we're going to credit the testimony and the people chose not to put in their own expert, knowing what the defense expert was going to testify to, they had experts. They had experts lined up. In fact, when the defense tried to call the people's New York state, I believe he was a New York state investigator who had performed similar tests, they blocked it saying that he wasn't an expert. And I think if we look at three judges have agreed with us, unfortunately, they weren't all on the same court. And if we look at Justice Smith's dissent in particular, in the New York State Court of Appeals, he drew a great outline for us of why this happened. He found that no rational trier of fact could find that he was a depraved mind murderer. So did Justice Reed in the New York State Court of Appeals and Justice Cohen and the appellate division. And Justice Smith came to an conclusion I think is very troubling and I think should be give this cause court pause, which is that it's the it's the serious tragedy in this case. It's the inflammatory facts. It's a horrific tragedy. A child died, a grown man died, and it's horrific. And Mr. Hygen made a really bad choice that night to drive drunk. However, he was sentenced to 18 to life for depraved indifference murder. He didn't consciously disregard a risk. There's no evidence that he consciously disregarded a risk. And that's what the people needed to prove to establish depraved indifference murder. He was sentenced to 18 to life. Had he been sentenced, had he been convicted of manslaughter, he would have maxed out already. And now he will face the parole board in a couple of years, and he's going to be at the whim of the political parole boards and that's going to be an issue for and something. Thanks very much, Ms. Hampton. I think we've got your honor. We appreciate it. I think you may have consumed some or all of what your rebuttal time might have been. But let's hear from counsel for the district attorney. Good afternoon, your honors. May it please the court and counsel. My name is Maureen McCormick, and I'm from the Nassau County District Attorney's Office. I represent Harold Graham as the superintendent of prison. Now, the criminal justice system is uncomfortable when a regular guy aberrantly engages in criminal conduct, whether he does so intentionally or with depraved indifference. I was thinking about this last night because Gabby Petito's case is all over the news, and now her regular guy boyfriend is a person of interest in that matter. But the fact is that on July 2, 2005, Martin Hygen slipped into a very dark place. And it's not something that counsel for the petitioner put in her brief, indicating that the people, the prosecution made this up. These are Mr. Hygen's own words. Ten hours after the collision in which he killed Stanley Rabinowitz and Katie Flynn, he told the state police investigators that he was in self-destruct mode, that his life had been nothing but problems since he had gotten to New York. It was never enough. Everything was going wrong. He was in a financial hole. He just wanted to work and make a living. But the job that he was working at was closing and did close. His friend who brought him there left the week before. His mother that he came to live with and hadn't seen and lived with for five years, moved out six months later to marry a man who was not his father. And he left town the night before the wedding and came back after the wedding. He was in a dark place, regardless of the partying atmosphere that he projected to his friends. But what he projected to his friends that was not an image conscious was that he was not slurring. He was not incapable of holding a conversation. He was not acting irrationally or that he did not know what his surroundings were before he just up and left the party that he was at without saying goodbye to anybody. And yet this is supposed to be the behavior of a happy, happy guy. And in fact, a happy guy who his friends said they had never seen him unhappy, never, in spite of all of the things in his life. The investigation confirmed and corroborated the statements that Mr. Hygen meant because he was in debt. His cell phone was in arrears. His student loans were backed up. His car payments were backed up. What he said was correct and the job that he had was about to disappear. So he was in a bad place when he found himself driving the wrong way on the Meadowbrook State Parkway and continued. His continuance is the depravity because as Judge Bianco referred to the testimony, the uncontroverted testimony of Dr. Klassen is that the perception reaction time of an intoxicated individual would be extended from between a half second to a second and a half or a sober person to five seconds, five seconds. This driver, Martin Hygen drove for more than two minutes the wrong way. He did not have the benefit of just a single piece of stimuli to notify him, to alert him that he was traveling the wrong way and grave risk to himself and everybody else on that roadway. Multiple cars, at least six of them, headlight to headlight in vast speeding closing speeds where the cars then veered suddenly out of the way. Horns honking three times. Multiple cars within that peripheral vision, that narrowed peripheral vision. They all came at him. Perhaps the first one could have been misunderstood, but not six. Not all of those drivers. Now as far as this... Mr. McCormack, can I just ask you about the speed issue? Ms. Harrington pointed out that there was a defense expert. There was no prosecution expert. If in fact he was slowing down under New York law, that could potentially be a problem for the prosecution because that would indicate obviously a desired effort to avoid, I guess. So do you want to address that? Yes, certainly, Your Honor. The concept of a person slowing down is something that has been factored by the courts and by triers of fact since Feingold was decided, but it does not mean in the same way that a person cannot be intoxicated and depraved, that a person could also not in a moment of self-preservation hit the brakes and suddenly be removed of the depravity they had toward everybody else on the road that night. But addressing specifically this case and this defendant's behavior, he did not slow down. And it is very clear from the jury's verdict that they rejected Stephen Schneider's testimony, who did a linear momentum calculation where he assessed the angles that these cars were at from a videotape rather than looking at, which is standard practice, the debris field and the damage to the cars. He assessed the point of impact by looking at a videotape and how the signs reflected off the hood of the vehicle rather than looking at the debris field where there was a dump. The fluid dump would be caused by the, I'm sorry, the radiator fluid, which is under pressure in the car. Once it was impacted, it would flood right to the ground. He disregarded Mr. Steve Davison, who said that the limo did not continue traveling south after it was hit, that it came to a dead stop, which is what's indicated by that debris field. He disregarded Stephen Weber. He actually disregarded absolutely everyone that didn't agree with anything he had to say. And if his testimony is read, you'll see that he will not concede the most common sense things that Stephen Weber, the motorcyclist on the very loud motorcycle less than 10 feet away from him over the center median divider, the small little fence between them. He disregarded the loudness of that. And the fact that Stephen Weber knew his speed, he was going 70 miles an hour. And he looked across at the man next to him, Martin Hygen, who did not appear to be lost, was not frenzied looking for a way out of this terrible situation, just driving like it's a regular day. 70 miles an hour, he was pacing him. So he knew his speed, he knew Hygen's speed. And less than two seconds later, he collided with that limousine. And had the brakes been hit, like Mr. Schneider said, there would have been a severe dipping of the front of that pickup truck before it hit that limousine. It didn't happen. It's in people's number 14 in evidence. It is the drive cam video. Those headlights come at that car steadily and levelly directly into the limousine before hitting it. He disregarded that Chris Tagney inside that vehicle was a trained police officer in speed assessment with a plus or minus of three miles an hour. And he estimated the speed of that oncoming pickup truck to be about 65 miles an hour. He disregarded anything that didn't go along with his guess from the videotape, his guess on the angles, his use of an inappropriate calculation. The jury was entitled to deny it or rather to disregard it. And they did, in fact, disregard it. Your Honor, this defendant cannot meet the deferential burden that is placed upon him. He cannot meet the standard that the state court was objectively unreasonable in its application of the sufficiency law or the Jackson standard that no rational juror could have found this defendant under all of the facts in the record of this case to be depraved indifference to human life. I see my time is up. I'll rely on the briefs. Thank you very much. Thank you. Ms. Harrington, is Ms. Harrington have any time left? Madam Clerk? Can I please have a little bit of time? Thank you. I appreciate that, Your Honors. Ms. McCormick's argument that he was in a dark place just is not supported by the record. Everybody who saw him that day said that he was fine. And no matter how hard we try to make him some depraved person who would deliberately drive on the wrong side of the road, no matter how hard we try to discredit Mr. Schneider, why didn't the people put on their own expert then if Mr. Schneider was so awful and so unworthy of belief? They had their experts lined up. They chose not to put them on because they didn't support their theory. And the one thing I would like to point out to the court before I lose my time is the new, and we talk about it a lot in our brief, is the new statutes that have been passed by New York State. And they really show that the depraved indifference murder statutes were being misapplied. And the legislature realized it needed to create these new aggravated vehicular murder and assault charges in order to rectify the problem of overzealous prosecutors who are overcharging defendants in cases where they simply do not have the proof. And no rational trier of fact could find that Mr. Hygen was a depraved mind murderer, that he suddenly put on this mask or took off a mask, however the prosecutor would like to say, took off this mask and drove two and a half miles looking for people to kill. It's just an outrageous assumption that's not supported by their proof. Thank you, your honors. I appreciate you letting me go over. No, thank you. Thank you very much. Thanks to both of you. We'll reserve the session and we'll go to another.